UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BETH ANN MOHR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-02425 |
| | ) | |
| v. | ) | Magistrate Judge Keys |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Beth Ann Mohr, moves this Court for Summary
Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse or remand the Commissioner of Social
Security's ("the Commissioner") final decision, which found that
she was not entitled to Disability Insurance Benefits ("DIB")
under the Social Security Act, 42 U.S.C. § 405(g).  Defendant
Commissioner has filed a Cross-Motion for Summary Judgment,
seeking an order affirming his decision.  For the reasons set
forth below, the Court grants Plaintiff's Motion and remands the
decision of the Commissioner.

## PROCEDURAL HISTORY

Ms. Mohr filed an application for DIB on September 23, 2005.
R. at 44.  She alleged that she became unable to work on
September 1, 2004, due to her disabling condition, and that she
last worked in July 2004.  R. at 78 & 80.  Her initial

application was denied on December 8, 2005. On January 13, 2006, she filed a Request for Reconsideration, which was denied on February 14, 2006. A Request for Hearing was filed on March 23, 2006. The hearing took place on June 4, 2008, in Peru, Illinois. In a decision dated June 23, 2008, Administrative Law Judge ("ALJ") David W. Thompson denied Ms. Mohr's application for benefits. Ms. Mohr filed a Request for Review of the ALJ's decision. On March 19, 2009, the Appeals Council denied review, making the ALJ's decision the Commissioner's final decision. This action in federal court was filed on April 22, 2009, seeking review of the ALJ's decision.

## FACTUAL HISTORY

### A. Plaintiff's Background

Ms. Mohr was born in December of 1970, in Peru, Illinois. R. at 88. At the time of her hearing, she was not married, had no children, and lived with her mother. R. at 31. From 1990 through June of 2004, Ms. Mohr worked at fast food restaurants, waiting on customers, cooking, cleaning, stocking, and working as a cashier. R. at 103, 114-18, & 147. At her first job, from 1990 to 1994 at Hardee's, Ms. Mohr worked five days per week, five hours per day. R. at 115 & 147. She used "machines, tools, or equipment" on the job, and she also used "technical knowledge or skills." R. at 115. At her second job, from 1994 to 1995 at

2

Baskin Robbins, Ms. Mohr again worked five days per week, five hours per day. R. at 116 & 147. She used machines, tools, or equipment, and her duties entailed writing and completing reports. R. at 116. At her third job, from 1995 to 1999 at Burger King, Ms. Mohr worked five days per week, six hours per day. R. at 117 & 147. She used machines, tools, or equipment, but did not need technical knowledge or skills to carry out her work. R. at 117. Finally, at her fourth job, from 1999 to 2004 at Taco Bell, Ms. Mohr worked three days per week, three hours per day. R. at 118 & 147. She did not use any machines, tools, or equipment, and she needed no technical knowledge or skills to carry out her tasks. R. at 118. At this last job, unlike at her prior jobs, Ms. Mohr did not cook or handle money. R. at 115–18.

Ms. Mohr stopped working on July 1, 2004. She wrote on her Disability Report that she stopped working because she "was beginning to have more seizures" and that this "caused a lot [sic] of problems at work." R. at 102. In September of 2005, Ms. Mohr filed for disability alleging that she had epilepsy, seizures, and a thyroid condition, and that she was a slow learner. R. at 50 & 53.

In her Activities of Daily Living Questionnaire,[1] Ms. Mohr indicated that she takes 550 milligrams of Dilantin and 50 milligrams of Synthroid per day. R. at 110. She said her

[1] This Questionnaire, prepared by the Bureau of Disability Determination Services, was filled out by Ms. Mohr in October of 2005.

problems began in 1985, when she was a freshman in high school. *Id.*

Ms. Mohr does household chores such as cleaning, dusting, and laundry twice a week; she goes shopping about twice a week. R. at 109. She usually drives (with her mother) when she leaves home, but she cannot drive when she has seizures. R. at 111. Describing changes in her ability to perform household chores since her condition began, Ms. Mohr wrote: "[i]f I have a seizure than [sic] I have to rest for an hour or so before I can start again. Sometimes I'm so tired I can't do very much." R. at 109. When asked if she had any problems concentrating or thinking, Ms. Mohr replied that she loses interest when reading. R. at 110. When asked if she was forgetful, Ms. Mohr answered "yes" and explained that she forgets how to do things when she doesn't do them often. *Id.* She indicated that she enjoys people and likes to be with others, but that she gets angry and fights with people when they disagree with her or call her names. R. at 111.

B. Medical Evidence

    1.   Treating Physician: Dr. Thomas Curry

Ms. Mohr was seen by Dr. Thomas Curry in December of 2004. At that time, Dr. Curry noted that "[Ms. Mohr] has not been feeling well because of stress on her job that is making her feel sick to her stomach. She finally quit that job and all of her symptoms have since disappeared." R. at 150. In July of 2005,

Ms. Mohr paid Dr. Curry another visit. She complained that she tended to get aggravated and "carry on quite a bit," but Dr. Curry said this only seemed to be situational and prescribed Lorazepam to see if that would help. *Id.*

    2.   <u>Treating Physician: Dr. Rakesh K. Garg</u>

In October of 2005, Dr. Rakesh K. Garg wrote a letter saying that he had seen Ms. Mohr off and on since 1987 for seizure disorder, that he would see her every six months and had last seen her on May 20, 2005, that she was on Dilantin, 550 milligrams a day, and that she had been "completely seizure[-]free for a long time." R. at 161. However, in March of 2008, Dr. Garg wrote another letter, this time stating that, in spite of their best effort, Ms. Mohr continued to have seizures "off and on." R. at 265. He noted that the seizures were unpredictable in nature and could not be controlled through medication. *Id.* He opined that Ms. Mohr was "not in a shape to be employed any[where]." *Id.*

After six months, in September of 2008, Ms. Mohr saw Dr. Garg again. Dr. Garg wrote a letter to Dr. Curry saying, "Some time ago . . . [Ms. Mohr's] Dilantin was reduced from 550 milligrams to 500 milligrams per day. Before that she used to have one seizure every six months or so and now she is having all most [sic] one or two every week." R. at 270.

*Illinois Valley Community Hospital*

Ms. Mohr was admitted to Illinois Valley Community Hospital on February 14, 2008, and discharged on February 15, 2008. In the Emergency Room Note, dated February 14, the clinical impression was stated as "seizure disorder" and "toxic Dilantin level." R. at 215. Once her Dilantin level decreased, she was released with instructions to continue Dilantin at 500 milligrams per day. R. at 231.

### 3. Clinical Psychologist: Dr. Mark B. Langgut

On November 11, 2005, consulting psychologist Dr. Mark B. Langgut prepared a psychological assessment of Ms. Mohr. According to Dr. Langgut's report, Ms. Mohr graduated from high school at the age of nineteen, with grades in the C range. R. at 162. She received special education services in grammar school. *Id.* Taunted by her peers, she had few friends at school, but maintained adequate social relationships with some students. *Id.*

Dr. Langgut's report stated that Ms. Mohr had a seizure disorder since childhood, and that as a child, she was hospitalized several times due to seizures. R. at 163. He indicated that, at the time of the assessment, her seizures were poorly controlled, even though she was taking Dilantin. *Id.* Ms. Mohr was able to complete her activities of daily living with some supervision and guidance; during the day, she helped her mother with household chores and walked around the mall. *Id.* She was able to drive, "despite having a seizure disorder." *Id.*

As for social relationships, Ms. Mohr had few friends and was generally alone. *Id.*

Dr. Langgut noted that no behavioral abnormalities were observed, but that Ms. Mohr gave evidence of overall impaired memory skills. R. at 163. The report also indicated that Ms. Mohr displayed adequate abstract reasoning skills that were appropriate to her age and educational background, but that she had mildly-impaired judgment skills and could become overwhelmed by tasks of modest complexity. *Id.* Furthermore, Dr. Langgut noted that "Ms. Mohr's thought processes were characterized by slowed speed, average coherence, and moderately increased suggestibility. [She] shifted topics with difficulty." *Id.*

On the Wechsler Adult Intelligence Scale - III, Ms. Mohr earned a Verbal I.Q. score of 73, a Performance I.Q. score of 68, and a Full Scale I.Q. score of 68. R. at 164. According to Dr. Langgut's report, these scores indicate that Ms. Mohr is functioning in the overall Mentally Deficient range of intellectual ability. *Id.*

Lastly, Dr. Langgut commented that Ms. Mohr appeared to have adequate basic skills that would allow her to manage and direct in a responsible manner those modest funds awarded to her. R. at 164.

    4.   <u>Medical Consultant: Dr. Leslie Fyans</u>

Dr. Leslie Fyans, the Social Security Administration's medical consultant, assessed Ms. Mohr's mental residual functional capacity ("RFC") in December of 2005. In her report, Dr. Fyans indicated that Ms. Mohr's ability to remember locations and work-like procedures, as well as her ability to understand and remember very short and simple instructions, was not significantly limited. R. at 179. However, Ms. Mohr's ability to understand and remember detailed instructions was moderately limited. *Id.*

According to the assessment, Ms. Mohr's abilities to carry out very short and simple instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to sustain an ordinary routine without special supervision, to work in coordination with others without being distracted by them, to make simple work-related decisions, and to complete a normal workday and workweek without interruptions from psychological symptoms, were not significantly limited. R. at 179-180. Ms. Mohr's ability to carry out detailed instructions was moderately limited. R. at 179.

Furthermore, Ms. Mohr's abilities to ask simple questions or request assistance, to respond appropriately to criticism from supervisors, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to set realistic goals or make plans

independently of others, were not significantly limited. R. at 180.

### C. Testimony

On June 4, 2008, a hearing was held before ALJ David W. Thompson in Peoria, Illinois. Ms. Mohr and vocational expert ("VE") Mr. Dennis W. Gustafson testified at this hearing.

#### 1. Plaintiff's Testimony

Ms. Mohr testified that she had received some special education (mostly for speech) in earlier grades of school. R. at 32-33. She said, "I guess when I was small I sort of was a slow learner." R. at 33. She testified that she had about three small seizures in an average month. R. at 36. She said that in addition, she had grand mal seizures a couple of times a year, and that she usually lost consciousness and ended up in the hospital when she had grand mal seizures. R. at 36-37 & 39. Stress brought the seizures on more frequently. R. at 39. The last time she had had a seizure was three days before the hearing, on June 1, 2008. R. at 35. When asked if she had any problems functioning on days that she didn't have seizures, Ms. Mohr answered, "no." R. at 38.[2]

---

[2]  Q: You can do the housework, you can take care of . . . the things out in the garden, you can walk, you can sit?
A: Yeah.
Q: You can stand and you can pick things up, all of that?
A: Yeah, yeah, uh-huh.
Q: So basically no limitations absent the seizures, is that

When asked if her job had come to an end because business had slowed down, Ms. Mohr answered, "Yeah." R. at 34. However, she subsequently testified that she probably would not have been able to continue working at the fast food restaurant even if their business hadn't slowed down, because her seizures "[came] on a couple of times." R. at 35.

Ms. Mohr testified that she had a driver's license, and that she drove about 20 miles a week, on average. R. at 38. She was capable of taking care of her personal hygiene needs, bathing herself, dressing herself, and feeding herself. *Id.*

### 2. Vocational Expert's Testimony

The ALJ asked the VE, Mr. Dennis W. Gustafson, whether a hypothetical individual of the same age, education, and experience as Ms. Mohr, limited to medium work, occasional climbing of ramps and stairs, occasional balancing and crouching, no climbing of ropes, ladders, or scaffolds, and no contact with the public, with a need to avoid even moderate exposure to hazards, would be able to perform Ms. Mohr's past work. R. at 41. Mr. Gustafson replied that such work would be ruled out on the basis of public contact. *Id.* Mr. Gustafson went on to testify that there are other jobs in the economy that such an individual could perform. *Id.* Light, sedentary manufacturing vocations such as a garment sorter, an egg processor, or a potato

---

correct?
    A: Yeah.

chip sorter were mentioned as examples. R. at 41-42. When asked whether the suggested jobs would change if, in addition to the above-mentioned restrictions, the individual were limited to simple, routine tasks, Mr. Gustafson replied, "I don't believe so." R. at 41.

### D. The ALJ's Decision

On June 23, 2008, the ALJ decided that Ms. Mohr was not disabled under sections 216(I) and 223(d) of the Social Security Act.

The ALJ first found that Ms. Mohr had not engaged in substantial gainful activity since September 1, 2004. R. at 18. He next found that Ms. Mohr had two severe impairments: seizure disorder and borderline intellectual functioning. *Id.* In making this determination, the ALJ considered Dr. Curry's assessment, Dr. Langgut's assessment, and records from the Illinois Valley Community Hospital. R. at 18-19. However, he did not afford Dr. Garg's opinion controlling weight, noting that it was "not supported by or consistent with the evidence of record as a whole." R at 18. The ALJ pointed out that Dr. Garg had written two "completely contradictory" letters, one in October of 2005 saying that Ms. Mohr was "completely seizure[-]free," another in March of 2008 saying that Ms. Mohr continued to have seizures "off and on." *Id.* The ALJ emphasized that, despite his opinion that Ms. Mohr could not work due to "potential risk" and the

"unpredictable nature of the seizures," there was no indication that Dr. Garg had restricted Ms. Mohr's ability to drive a motor vehicle. R. at 19.

Next, the ALJ found that Ms. Mohr did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 19. The ALJ found that there was no evidence of seizures of such frequency or with such residuals affecting behavior or activities, as required by Listings 11.02 or 11.03. See 20 C.F.R. § 404, subpt. P, app. 1. He also determined that Ms. Mohr did not suffer from organic mental disorders or mental retardation under Listings 12.02 and 12.05. See *id.* Ms. Mohr had, at most, a mild limitation in activities of daily living. R. at 20. Although she could have moderate difficulties in maintaining social functioning and concentration, persistence, or pace, this would not prevent her from performing simple and routine work. *Id.* There was no evidence of repeated episodes of decompensation. *Id.* See 20 C.F.R. § 404, subpt. P, app. 1.

In assessing Ms. Mohr's RFC, the ALJ determined that Ms. Mohr had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567©, but limited her to occasional climbing of ramps and stairs, and no climbing of ladders, ropes, or scaffolds. R. at 20. The ALJ also limited Ms. Mohr to occasional balancing and crouching, to avoiding even moderate exposure to hazards, and to

simple and repetitive tasks, with no contact with the public. *Id.* The ALJ noted that no physician had imposed any specific work-related restrictions, R. at 21, and that the record as a whole did not reveal seizures of such frequency, severity, or with such residuals that would prevent all work activity. R. at 22. He stated that he accommodated Ms. Mohr's seizure disorder by limiting her to medium work with restrictions in posture and working around hazards. *Id.* As for any intellectual deficits Ms. Mohr might have, the ALJ stated that he accommodated them by limiting her to simple and repetitive tasks with no contact with the public. *Id.*

The ALJ determined that Ms. Mohr was unable to perform any past relevant work, but that considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Ms. Mohr could perform. R. at 22.

## STANDARD OF REVIEW

A district court will reverse the findings of the Commissioner only if they are not supported by substantial evidence or if they are the result of an error of law. 42 U.S.C. § 405(g); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). In the substantial-evidence determination, the court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute

the court's own judgment for that of the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence, although more than a mere scintilla of proof, is no more than such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Nevertheless, the court conducts a "critical review of the evidence" before affirming the Commissioner's decision, *Clifford*, 227 F.3d at 869, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues, *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

### SOCIAL SECURITY REGULATIONS

In deciding whether a claimant has met his burden of establishing disability, an ALJ applies a standard five-step inquiry. See 20 C.F.R. § 404.1520. This requires the ALJ to evaluate, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, see 20 C.F.R. § 404,

14

subpt. P, app. 1; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is capable of performing work in the national economy. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). Under this five-part sequential evaluation process, an affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled. *Id.* (citation omitted). If a claimant reaches Step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy. *Id.*

## DISCUSSION

Ms. Mohr moves this Court for summary judgment to reverse or remand the Commissioner's final decision, which found that she was not entitled to DIB under the Social Security Act, 42 U.S.C. § 405(g).

A. Impairments Under Listings 12.02 and 12.05

It is unclear whether the ALJ's finding that Ms. Mohr did not meet the requirements of Listings 12.02 and 12.05 was supported by substantial evidence.

First, in addressing Ms. Mohr's adaptive functioning under Listing 12.05,[3] the ALJ stated, "[t]he undersigned finds no evidence of such deficits in adaptive functioning that would meet the requirements for mental retardation." R. at 19. His reasons for reaching this conclusion were that Ms. Mohr received special education only during grammar school; she had worked successfully in the past; she alleged that her disability was due to seizures, not mental retardation; and she was found to have adequate skills to manage her own funds, undermining Dr. Langgut's opinion that she would have more success with clear, unambiguous tasks with repeated instruction. R. at 19-20.

But whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). The only expert opinion that the ALJ relied upon in assessing Ms. Mohr's adaptive functioning was Dr. Langgut's opinion that Ms. Mohr "appears to have adequate *basic* skills that

---

[3] Listing 12.05 and its relevant subsection are as follows:
12.05 *Mental retardation:* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
. . .
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.
20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

will allow her to manage and direct those *modest* funds awarded to her in a responsible manner." R. at 164 (emphasis added). The ALJ also disregarded the fact that Ms. Mohr did not solely claim physical impairment – she also claimed that she was a "slow learner." R. at 102.

The Commissioner asserts that the fact that Ms. Mohr worked at fast food restaurants for fourteen consecutive years supports the ALJ's finding that Ms. Mohr did not meet the adaptive functioning requirement of Listing 12.05. However, having a job is not necessarily inconsistent with a claim of disability. *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). A person can be totally disabled for purposes of entitlement to social security benefits even if she is, in fact, working. *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). See also *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003) ("[T]he fact that a person holds down a job doesn't prove that he isn't disabled."); *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998) ("[E]mployment is not proof positive of ability to work."). The reason Ms. Mohr stopped working in 2004 was, at least in part, because her seizures were purportedly getting worse. An individual's mental and/or physical conditions may change over time, and, therefore, past performance at work may not be determinative of one's present adaptive functioning. In fact, evidence that Ms. Mohr's annual earnings decreased from 2001 to

17

2004, R. at 95-96,[4] and evidence that Ms. Mohr used "machines, tools or equipment" in her first three jobs (from 1990 to 1999), but not in her fourth job (from 1999 to 2004), arguably supports Ms. Mohr's contention that her condition was deteriorating. Yet there is no indication in the ALJ's decision that he considered this evidence in determining whether she met or equaled Listing 12.05.

Next, in assessing whether Ms. Mohr met the requirements of organic mental disorders under Listing 12.02,[5] the ALJ determined that Ms. Mohr had only mild limitations in performing her daily activities. One of the grounds for this finding was that Ms. Mohr "testified to a variety of daily activities." Similarly, the Commissioner contends that Ms. Mohr's ability to do daily activities like household chores and preparing meals supports the ALJ's conclusion that Ms. Mohr does not have a deficit in adaptive functioning under Listing 12.05. However, the Seventh Circuit has cautioned the Social Security Administration against placing undue weight on a claimant's household activities in

---

[4] Ms. Mohr's earnings were $7,440.78 in 2001, $5,613.77 in 2002, $3,941.54 in 2003, and $1,397.31 in 2004. R. at 95-96.
[5] Under Listing 12.02, a claimant is disabled if he exhibits two of the following impairments:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.
See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.

assessing the claimant's ability to hold a job outside the home. *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). See also *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("The administrative law judge's casual equating of household work to work in the labor market cannot stand."); *Smith v. Barnhart*, 59 Fed. Appx. 901, 907 (7th Cir. 2003) ("The fact that a claimant is able to engage in limited daily activities, such as washing dishes, doing laundry, and cooking meals does not necessarily demonstrate that she is not disabled.").

Moreover, the records do not show how rigorous or strenuous Ms. Mohr's performance of household chores were. For example, although Ms. Mohr indicated in her Activities of Daily Living Questionnaire that she did "cleaning," this is a broad term that could mean anything from wiping countertops with a rag to house-wide spring cleaning. Broad descriptions of household chores may not draw an accurate picture of a claimant's adaptive functioning. See, e.g., *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (stating that the ALJ ignored the claimant's qualifications as to how he carried out his daily activities – the claimant's so-called "daily walk" was merely to the mailbox at the end of the driveway, and his vacuuming took only four minutes); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (stating that the ALJ ignored numerous qualifications regarding the claimant's daily activities: while washing dishes she shifted

her weight but still experienced pain; when she last went to the store she had to use the cart for support and was unable to stay long). In fact, the ALJ himself stated that Ms. Mohr "helps her mother" with household chores, and he acknowledged the fact that Ms. Mohr went shopping with her mother, not by herself.

With regard to whether Ms. Mohr exhibited marked difficulties in maintaining concentration, persistence, or pace under Listing 12.02, the ALJ stated that, although Ms. Mohr may have moderate difficulties, "a moderate limitation in this area would not prevent the performance of work." Under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3), an ALJ must "exercise great care" in reaching a decision about a claimant's ability to maintain concentration, persistence, and pace, and pay particular attention to the claimant's ability to perform on a sustained basis under the stresses of employment. *Smith*, 59 Fed. Appx. at 907. Here, the ALJ did not consider, for example, Dr. Curry's diagnosis that stress from her job caused Ms. Mohr not to feel well. The records show that Dr. Curry even prescribed Lorazepam, a medication that is used to relieve anxiety.

The ALJ's finding that Ms. Mohr's condition satisfied neither Listing 12.02 nor Listing 12.05, was not ideal; his reasoning was shaky, he failed to elicit testimony that might have clarified Ms. Mohr's abilities, and he should have indicated whether he considered Dr. Curry's diagnosis. While the Court

might not have remanded on this issue alone, the other issues raised by Ms. Mohr indicate that remand is warranted. Upon remand, the Court instructs the ALJ to be mindful of these issues in issuing his decision.

B. RFC Finding

Ms. Mohr first argues that, in making his RFC finding, the ALJ erred by not giving controlling weight to Dr. Garg's opinion that Ms. Mohr could not work anywhere. Dr. Garg was Ms. Mohr's treating physician. The ALJ found that Dr. Garg's opinion was not supported by or consistent with the record as a whole; importantly, he also found that Dr. Garg's opinion was inconsistent with his own prior statement. The ALJ based this conclusion on Dr. Garg's notes from October of 2005, that Ms. Mohr was taking 550 milligrams of Dilantin per day, and that she had been "completely seizure[-]free for a long time." R. at 161. He said that she had no other medical problems and was doing well. *Id.* In contrast, in March of 2008, Dr. Garg stated that, despite their best efforts, Ms. Mohr continued to have seizures "off and on," and that her condition of permanent epilepsy was not going to go away. R. at 265.

The Commissioner notes that 20 C.F.R. § 404.1527(d)(2) provides that, if the ALJ finds that a treating physician's opinion is "well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the]

21

record," it will be given controlling weight. *Flores v. Massanari*, 19 Fed. Appx. 393, 402 (7th Cir. 2001). The ALJ's reasoning was that, since Dr. Garg's opinion was inconsistent, it would not be given controlling weight. However, the discrepancy between Dr. Garg's letters may have been because Ms. Mohr's condition worsened after Dr. Garg's first letter, as there was a gap of two-and-a-half years between Dr. Garg's letters.

The ALJ could and should have contacted Dr. Garg for clarification on this issue. S.S.R. 96-2p says: "[I]n some instances, additional development required by a case . . . may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record." See also *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) ("If the ALJ thought he needed to know the basis of [medical] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them."). The ALJ could have subpoenaed Dr. Garg or requested additional information through other means.

The ALJ's stance is particularly troubling because Dr. Garg's letter in March of 2008, noting that Ms. Mohr was suffering from unpredictable seizures, was consistent with three other important

pieces of evidence: (1) Ms. Mohr's testimony that she stopped working in July of 2004 because her seizures were getting worse; (2) Dr. Langgut's assessment in November of 2005 that Ms. Mohr's seizures were poorly controlled; and (3) Ms. Mohr was taking so much medication in her effort to combat her seizure disorder that she ended up in the hospital in February of 2008 with toxic Dilantin levels. In light of this evidence, the Court finds that the ALJ was too quick to credit the only evidence in the record suggesting that Ms.Mohr's seizures were well controlled.

The ALJ also questioned the fact that Dr. Garg had not cautioned Ms. Mohr against driving, despite her seizure disorder. The ALJ noted that Ms. Mohr was driving on a regular basis. However, Ms. Mohr indicated in her Activities of Daily Living Questionnaire that she drove only with her mother next to her. She also specifically added that, when she has seizures, she cannot drive. More importantly, the ALJ could have asked Dr. Garg why he did not deter Ms. Mohr from driving, when he thought Ms. Mohr was "not in a shape to be employed any[where]." R. at 265. But the ALJ did not do so.

At the least, the ALJ should have articulated in more detail how Dr. Garg's opinion was inconsistent with the record as a whole. Dr. Garg had been treating Ms. Mohr since 1987, when she was seventeen, and the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and

responses should be given great weight in disability
determinations. *Flores v. Massanari*, 19 Fed. Appx. 393, 402 (7th
Cir. 2001) (citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir.
2000)). The ALJ had an obligation to flush out the truth and he
failed to do so in this case.

Ms. Mohr next argues that the ALJ failed to consider Dr.
Langgut's opinion that Ms. Mohr would "likely be more successful
with tasks that are clear, unambiguous and presented with brief
and repeated instruction," R. at 164, in fashioning her RFC.[6]

The Court disagrees that the ALJ did not accommodate Ms.
Mohr's intellectual limitations. In his decision, the ALJ was
careful to limit Ms. Mohr to simple and repetitive tasks. Ms.
Mohr argues that a need for repeated instructions is not the same
as an ability to only be able to carry out simple and repetitive
tasks. But Ms. Mohr fails to explain how the two are materially
different, and the evidence in the record does not support any
limitations greater than what the ALJ found in this regard.

Finally, Ms. Mohr argues that the ALJ failed to consider all
restrictions on her RFC. Notably, the hypothetical posed to the

---

[6] The Commissioner argues that Ms. Mohr's work history negates her need
for "brief and repeated instruction." However, there was no inquiry
by the ALJ into whether or not Ms. Mohr had received repeated
instructions at her prior jobs. Nothing in the record shows that Ms.
Mohr needed such special accommodations, but nothing shows that she
did not, either. Evidence in the record that Ms. Mohr "had to stop
and ask her mom a lot [sic] of [] questions," R. at 99, and that she
forgets how to do things when she doesn't do them often, R. at 110,
corroborate Ms. Mohr's need for brief and repeated instructions when
performing tasks.

VE by the ALJ did not mention Ms. Mohr's seizure disorder.
Considering the fact that Ms. Mohr testified that, when she has
grand mal seizures, she loses consciousness and ends up in the
hospital, the ALJ should have either mentioned or described a
seizure disorder in his hypothetical to the VE. Although the ALJ
mentions that he accommodated Ms. Mohr's seizure disorder by
limiting her to medium work with restrictions in posture and
working around hazards, it was not for the ALJ to decide that
these restrictions were sufficient, given the alleged intensity
of Ms. Mohr's seizures. See *Young v. Barnhart*, 362 F.3d 995,
1005 (7th Cir. 2004) ("When the hypothetical question is
fundamentally flawed because it . . . does not include all of the
limitations supported by medical evidence in the record, the
decision of the ALJ that a claimant can adjust to other work in
the economy cannot stand."). Without a limitation regarding
seizures, the VE's opinion (based on the ALJ's hypothetical) that
there are jobs that an individual like Ms. Mohr could perform
would not have been entirely reliable.

The Commissioner counters that, in making the RFC
assessment, the ALJ found that the record as a whole does not
reveal seizures of such frequency, severity, or with such
residuals that would prevent all work activity. The Court
disagrees. As discussed above, with the exception of Dr. Garg's
statement in October of 2005 that Ms. Mohr's seizures were well

controlled, all of the other evidence in the record on this point suggests that Ms. Mohr's seizures were serious and disruptive.

Instead of citing to the medical evidence in the record, it appears that the ALJ relied upon his own lay assessment of Ms. Mohr's seizure disorder. An ALJ "must not succumb to the temptation to play doctor and make [his] own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).[7] An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable, *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(3)), and he may not substitute his own judgment for that of an expert, *Hubbard-Davis v. Callahan*, 1997 U.S. App. LEXIS 18439 (7th Cir. 1997).

The ALJ did not build a "logical bridge" from the evidence to his conclusion that Ms. Mohr's seizures were not of such frequency and severity to prevent her from work. See *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (citing *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)) ("We require that an ALJ build an 'accurate and logical bridge from the evidence to [his] conclusion' so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."). Rather, he relied on his

---

[7] In *Rohan*, the ALJ disregarded objective evidence submitted by a doctor. The Seventh Circuit found that it was improper for the ALJ to have done so.

26

own conjecture and assessment of the medical evidence. If he felt the evidence in the record did not clearly reveal the frequency, severity, and/or residuals of Ms. Mohr's seizures, he could have called upon a medical expert to testify on the nature of Ms. Mohr's seizures; or questioned her treating physicians[8]

Detailed evidence on Ms. Mohr's seizures was something that the ALJ needed to make an informed decision, as an increase in the frequency of seizures was one of the primary reasons Ms. Mohr quit work and claimed disability benefits. Before concluding that "the claimant's statements concerning the intensity, persistence and limiting effects of [the] symptoms [of her seizures] are not credible to the extent they are inconsistent with the [RFC] assessment," R. at 21, the ALJ should have sought more information about Ms. Mohr's seizures. See *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) ("If the medical record does not corroborate the level of pain reported by the claimant, the

---

[8] According to the record, in January of 2009, Ms. Mohr's mother, Patricia Mohr, filled out a Seizure Description Form, describing her daughter's seizures as she witnessed them. Under "Dates of seizures witnessed," Ms. Patricia Mohr wrote seventeen dates, all in 2008. She then added that she had witnessed "so many [she couldn't] count all of them." R. at 272. In describing a typical seizure, Ms. Patricia Mohr indicated that her daughter sometimes loses consciousness and makes jerking, thrashing movements. *Id.* According to her, her daughter has been injured during seizures - she "broke her wrists," "broke her fingers," "smashed her face when she fell," and "always has black and blue marks and does not know how she got there." *Id.* Notably, this evidence was not before the ALJ, but was prepared in anticipation of an appeal, seven months after the ALJ's decision.

ALJ must develop the record and seek information about the severity of the pain and its effects on the applicant.").

This Court holds that the ALJ's RFC finding was therefore not supported by substantial evidence.

## CONCLUSION

Upon review, this Court does not find that the ALJ's decision to deny Ms. Mohr disability benefits is supported by substantial evidence. For the foregoing reasons, this case is REMANDED for further proceedings consistent with this opinion.


Dated: August 24, 2010



ENTER:




ARLANDER KEYS
United States Magistrate Judge